**FILED**

Mar 16 2017, 9:37 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Ryan P. Dillon
Marita K. Webb
Dillon Legal Group, P.C.
Franklin, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Adoption of C. J., A Minor, | March 16, 2017 |
| S. R., | Court of Appeals Case No. 41A01-1608-AD-2007 |
| *Appellant-Respondent,* | Appeal from the Johnson Superior Court |
| v. | The Honorable Kevin Barton, Judge |
| M. J., | Trial Court Cause No. 41D01-1408-AD-30 |
| *Appellee-Petitioner,* | |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, S.R. (Mother), appeals the trial court's decree of adoption of her biological child, C.J. (Child), by Appellee-Petitioner, M.J. (Stepmother).

We reverse and remand.

# ISSUE

Mother raises four issues on appeal, one of which we find dispositive and which we restate as follows: Whether Mother knowingly and voluntarily waived her right to counsel at the adoption hearing, where the trial court failed to impress upon her the serious consequences she faced if she represented herself.

# FACTS AND PROCEDURAL HISTORY

Mother and E.J. (Father) are the biological parents of the Child, born on September 8, 2009, in Franklin, Johnson County, Indiana. On September 10, 2009, Father executed a paternity affidavit for the Child. At some point thereafter, a paternity action was commenced in the Johnson Circuit Court under Cause Number 41C01-1106-JP-00145 (the paternity court). On January 11, 2012, the paternity court issued an order on custody, support, and parenting time. The paternity court awarded legal and physical custody of the Child to Father and ordered Mother to pay $25.00 per week in child support. Mother, who was suffering from a substance abuse addiction, was to receive supervised parenting time as agreed upon by the parties. Mother was also ordered to complete a ten-panel hair follicle drug test in order to increase her parenting

time in accordance with the Indiana Parenting Time Guidelines. Mother, however, never successfully passed a drug screen.

[5] Following the paternity court's order, Mother initially participated in supervised parenting time several times per week at Father's home. In 2012, Father and Stepmother began dating, and in the summer of 2012, Stepmother and her daughter from a prior relationship moved in with Father and the Child. At that point, Mother ceased exercising parenting time, although Mother did visit the Child once in December of 2012. Since that time, however, Mother has not seen the Child. On January 2, 2013, Father and Stepmother were married. Thereafter, Stepmother assumed the maternal role in the Child's life and acted as a primary caretaker. From January of 2013 until December of 2013, Father was deployed to Afghanistan. During that time, the paternity court appointed Stepmother as the Child's temporary guardian, and Stepmother ensured that all of the Child's needs were met.

[6] On August 14, 2014, Stepmother filed a petition to adopt the Child in the Johnson Superior Court under Cause Number 41D01-1408-AD-30 (adoption court). In her petition, Stepmother alleged that Mother's consent to the adoption was not required because Mother had not "for a period of at least one year, and without justifiable cause, communicated significantly with the [C]hild when able to do so" and because Mother had "abandoned or deserted the . . . [C]hild for at least six months immediately prior to the filing of [the adoption

petition]." (Appellant's App. Vol. II, p. 2).[1] Stepmother subsequently filed an amended adoption petition (on June 9, 2015), to additionally argue that Mother's consent to the adoption was not required because, for a period of at least one year, Mother had failed to provide for the care and support of the Child in accordance with the paternity court's support order. Along with Stepmother's adoption petition, Father filed his consent to Stepmother's adoption of the Child. At the time, Father and Stepmother were unaware of Mother's whereabouts and hired an investigator to track her down. It was not until three months after Stepmother filed her petition that Mother was served with notice of such.

[7] From September of 2013 until June of 2014, Mother was incarcerated. After she was released, Mother filed a motion with the paternity court for a modification of her parenting time with the Child. On October 15, 2014—prior to Mother receiving notice of the adoption petition—the paternity court held a hearing on Mother's motion. On October 17, 2014, Mother filed a letter with the paternity court seeking joint custody of the Child. Six days later, she again filed correspondence with the paternity court, reiterating her request for assistance in being able to visit with the Child and requesting joint custody. On November 6, 2014, the paternity court issued an order, finding that it would be in the Child's best interest for Mother to resume exercising parenting time "with

---

[1] Ultimately, Stepmother did not pursue the abandonment argument as a basis for contending that Mother's consent to the adoption was not required.

a twenty (20) week phase-in period." (Appellant's App. Vol. III, p. 89). Following the phase-in period, Mother was to have parenting time in accordance with the Indiana Parenting Time Guidelines.

[8] In November of 2014, Mother was served with notice of Stepmother's adoption petition, and on November 24, 2014, she filed her objection to the Child's adoption by Stepmother. In response to Stepmother's contention that Mother's consent was not required for the adoption to proceed, Mother claimed that she had never abandoned the Child and further asserted that Father and Stepmother had denied her efforts to see or communicate with the Child. On December 23, 2014, Mother filed a motion to consolidate the pending case in the adoption court with the ongoing case in the paternity court. On January 21, 2015, the paternity court transferred its case to the adoption court.

[9] On April 7, 2015, Stepmother filed a home study with the adoption court in accordance with Indiana Code section 31-19-8-5. The home study was completed by Terrence Lovejoy (Lovejoy), a social worker with the Children's Bureau, Inc., and included background checks into Stepmother's criminal history and any involvement with the Department of Child Services (DCS). The background checks revealed Stepmother's two prior convictions for driving while intoxicated, in 2009 and 2012, as well as arrests/citations in 2011 and 2012 for contempt and driving while suspended, respectively. Stepmother has had no prior involvement with DCS. Nevertheless, during the home visit, Lovejoy was reassured that alcohol was no longer a problem in Stepmother's life. Lovejoy reported that Stepmother has been

the primary and sole maternal figure currently involved in the life of [the] five-year-old [Child]. This includes being his sole caregiver for nearly a year when his [F]ather was deployed in the military. [The Child] refers to [Stepmother] as being his mother and seems to genuinely see her as such.

(Appellant's App. Vol. II, p. 73). Ultimately, Lovejoy concluded that he "would support a recommendation to grant" Stepmother's adoption petition "provided that [the Child] were to be deemed legally free for adoption." (Appellant's App. Vol. II, p. 73).

[10] On June 25, 2015, the adoption court held a hearing on the issue of whether Mother's consent was required for the adoption. At the beginning of the hearing, Mother informed the court that her attorney had withdrawn three months earlier due to her inability to afford him, and she requested that the court appoint her new counsel. The adoption court questioned Mother regarding her financial circumstances. Mother indicated that she works between forty and forty-five hours per week for a cleaning company, earning $10.00 per hour. In addition, Mother stated that she works about twenty-four hours each week for another company earning $7.50 per hour. Mother described that she had monthly expenses totaling $855. The adoption court determined that Mother had sufficient income to pay for an attorney and therefore had made a "voluntary choice" to proceed without the assistance of counsel. (Tr. Vol. II, p. 12).

[11] Stepmother subsequently presented her case-in-chief. According to Stepmother's testimony, Mother saw the Child on two occasions in 2012.

Then, in 2013, Mother only once attempted to see the Child but cancelled the meeting due to a job interview. Stepmother further explained that for a portion of 2013, Mother was incarcerated, and during that time, Mother did not make any effort to communicate with the Child. As for 2014, Stepmother testified that Mother made two requests to see the Child—one of those being in November of 2014 after the petition for adoption had been filed. At that point, the paternity court had ordered the phase-in parenting time for Mother, but Stepmother testified that Mother never showed up for her scheduled time. Stepmother made it clear that she never interfered with Mother's attempts to have parenting time. Father also testified during Stepmother's case-in-chief. According to Father, between June 28, 2011, and June 23, 2015, Mother paid $2,757.60 in child support and was $2,417.40 in arrears. Mother did not cross-examine Stepmother or Father.

[12] During Mother's case-in-chief, she contradicted the testimony of Father and Stepmother. Mother indicated that, in 2012, she participated in parenting time with the Child on a regular basis at Father's house until Stepmother moved in, at which time she was no longer permitted to see the Child. Mother testified that there were multiple occasions over the years where she was refused parenting time by Father and Stepmother—that they refused to answer their door and ignored her phone calls and text messages to them. According to Mother, the last time Father permitted her to see the Child was in December of 2012, at which time Father ordered her to refrain from referring to herself as the Child's mother in the Child's presence because "[Stepmother] was his new

mom." (Tr. Vol. II, p. 63). Mother stated that she continued to send text messages on a daily basis, begging to see the Child. Mother admitted that in 2012 and 2013, she was suffering from a longstanding addiction to painkillers. By the time of the hearing, Mother claimed that she had been sober for two years.

[13] After Mother very briefly testified about her attempts to see the Child, the adoption court asked Mother a substantial number of questions. During the adoption court's examination, Stepmother raised the following objection:

> I'm going to say this, I want to say this very respectfully, but it appears that the [c]ourt is acting as an advocate for [Mother]. Uh, she chose to not have any attorney in this matter and, um, I just feel that it, that it's improper. It seems like the [c]ourt and, again, respectfully say this, that the [c]ourt is acting as an advocate for her and that's what I would base my objection on this matter.

(Tr. Vol. II, p. 72). The adoption court stated that it "respect[ed]" Stepmother's objection and "discontinue[d] further examination." (Tr. Vol. II, p. 72). Instead, the adoption court appointed counsel for Mother and continued the hearing.

[14] On October 29, 2015, the adoption court resumed the hearing on the issue of Mother's consent, with Mother appearing by appointed counsel. As the adoption court clarified at the beginning of the hearing, it was to be "a continuance of the June 25th hearing, not a new hearing, so [they were to] pick up where [they] left off." (Tr. Vol. II, p. 73). Mother proceeded with her case-

in-chief, once again testifying that throughout 2012, 2013, and 2014 (with the exception of when she was incarcerated), her attempts to see the Child were thwarted by Father and Stepmother.

[15] On December 15, 2015, the adoption court issued its Order on Mother's Consent. The adoption court found that Mother's consent to the adoption of the Child by Stepmother was not required pursuant to Indiana Code section 31-19-9-8(a)(2)(A) because Mother had failed to communicate significantly with the Child for at least one year. In particular, the adoption court found "a lack of communication for the period from the visitation before Christmas of December[] 2012 through the date of filing of the [adoption petition] on August 20, [*sic*] 2014." (Appellant's App. Vol. III, p. 21). The adoption court further found that Mother's "testimony of daily efforts to obtain visitation [was] improbable, and that [Mother] did not seek visitation until after her release from incarceration when she was sober." (Appellant's App. Vol. III, p. 21).[2] As to Stepmother's alternative contention that Mother's consent was not required based on a failure to provide support for the Child for more than one year, the adoption court determined that Stepmother had failed to meet her burden of proving that Mother was capable of paying support.

---

[2] The adoption court found that Father and Stepmother began blocking Mother's attempts to visit the Child in the summer of 2014, following Mother's release from incarceration, because at that time, Stepmother had decided to pursue adoption. Nevertheless, the adoption court found such conduct to be "of no moment inasmuch as a period in excess of one year . . . as required under Indiana Code [section] 31-19-9-8(a)(2)(A) ha[d] been determined to exist." (Appellant's App. Vol. III, p. 22).

On July 20, 2016, the adoption court conducted a hearing on Stepmother's adoption petition as to the issue of the Child's best interest. On August 8, 2016, the adoption court issued a Decree of Adoption, finding by clear and convincing evidence that it is in the Child's best interest to be adopted by Stepmother. In granting Stepmother's petition for adoption, the adoption court terminated Mother's parental rights to the Child. The adoption court found it significant that the Child "identifies [Stepmother] as his mother. He regards [Stepmother's] family as being the maternal family. [Mother] is unknown to him. [The Child] does not recognize [Mother] as his mother." (Appellant's App. Vol. III, p. 66). While the adoption court sympathized with Mother's "desire to now establish the relationship with [the Child] that she had previously given up," it declined to undermine the Child's stability or to "endanger a healthy parent-child relationship in which the [C]hild has identified [Stepmother] as his mother." (Appellant's App. Vol. III, p. 70). Furthermore, the adoption court issued an order on the same day declaring that the paternity court's November 6, 2014 parenting time order was entered without jurisdiction based on the fact that an adoption petition had been filed.

Mother now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

Mother appeals the adoption court's decree of adoption in favor of Stepmother. At the outset, we note that Stepmother has not filed an appellee's brief with our court. It is well established that our court "will not undertake the burden of

developing arguments for the appellee." *In re Adoption of N.W.R.*, 971 N.E.2d 110, 112 (Ind. Ct. App. 2012). Furthermore, we apply "a less stringent standard of review" and "may reverse the trial court if the appellant establishes prima facie error." *Id.* at 113. "Prima facie error is defined as at first sight, on first appearance, or on the face of it." *Id.*

[19] Pursuant to Indiana Code section 31-19-11-1(a), the trial court shall grant an adoption petition if, in relevant part, the adoption is in the child's best interest; the petitioner is sufficiently capable of rearing and supporting the child; and proper consent, if required, has been given. Following the entry of an adoption decree, our standard of review on appeal "is to consider the evidence most favorable to the petitioner and the reasonable inferences which can be drawn therefrom to determine whether sufficient evidence exists to sustain the trial court's decision." *In re Adoption of S.O.*, 56 N.E.3d 77, 80 (Ind. Ct. App. 2016). Our court will not overturn the trial court's decision regarding an adoption "unless the evidence at trial led to but one conclusion and the trial court reached an opposite conclusion." *Id.* We do not reweigh evidence, and because we presume that the trial court's decision is correct, the appellant bears the burden of overcoming that presumption. *In re Adoption of H.N.P.G.*, 878 N.E.2d 900, 903 (Ind. Ct. App. 2008), *trans. denied*.

[20] Additionally, in this case the adoption court entered findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A).

> Thus, we must first determine whether the evidence supports the findings and second, whether the findings support the judgment.

> We will not set aside the findings or the judgment unless they are clearly erroneous. The trial court's findings of fact are clearly erroneous if the record lacks any evidence or reasonable inferences to support them. A judgment is clearly erroneous when it is unsupported by the findings of fact and the conclusions relying on those findings.

*In re Adoption of T.W.*, 859 N.E.2d 1215, 1217 (Ind. Ct. App. 2006) (internal citations omitted).

## II. *Court-Appointed Counsel*

[21] Mother claims that the adoption court committed reversible error by failing to appoint her an attorney until after Stepmother had rested her case at the hearing on Mother's consent. Due process safeguards preclude "state action that deprives a person of life, liberty, or property without a fair proceeding." *In re G.P.*, 4 N.E.3d 1158, 1165 (Ind. 2014) (quoting *In re C.G.*, 954 N.E.2d 910, 916 (Ind. 2011)). As our courts have previously noted, a parent has a fundamental liberty interest in the care and custody of her child. *Petition of McClure*, 549 N.E.2d 392, 395 (Ind. Ct. App. 1990). Thus, we have held it to be a violation of due process if a child is removed from "an indigent parent without affording that parent the right to assistance of court-appointed counsel." *Id.*

[22] Indiana's law governing juvenile court procedures provides that "[a] parent is entitled to representation by counsel in proceedings to terminate the parent-child relationship." Ind. Code § 31-32-2-5. Furthermore, Indiana Code section 31-32-4-1(2) states that "[a] parent, in a proceeding to terminate the parent-child relationship" is "entitled to be represented by counsel." More specifically, if

> (1) a parent in proceedings to terminate the parent-child relationship does not have an attorney who may represent the parent without a conflict of interest; and
>
> (2) the parent has not lawfully waived the parent's right to counsel under [Indiana Code chapter 31-32-5];
>
> the juvenile court shall appoint counsel for the parent at the initial hearing or at any earlier time.

I.C. § 31-32-4-3(a). The right to counsel in a termination proceeding may only be waived "if the parent does so knowingly and voluntarily." I.C. § 31-32-5-5.

[23] Because a biological parent's rights are necessarily terminated by an adoption, we have previously held that "[t]he rights afforded by the involuntary termination statutes apply in adoption proceedings where the petitioners seek to adopt over the objections of one or both of the natural parents." *Taylor v. Scott*, 570 N.E.2d 1333, 1335 (Ind. Ct. App. 1991), *trans. denied*; *see* I.C. § 31-19-15-1(a)(2) (providing that biological parents are divested of all rights to their child upon the child's adoption). Thus, parents whose parental rights will be terminated in an adoption proceeding "have three rights: (1) 'the right to be represented by counsel'; (2) 'the right to have counsel provided if [they] could not afford private representation'; and (3) 'the right to be informed of the two preceding rights.'" *In re Adoption of G.W.B.*, 776 N.E.2d 952, 954 (Ind. Ct. App. 2002) (alteration in original) (quoting *Taylor*, 570 N.E.2d at 1335).

[24] Although the termination statute simply provides that a parent is entitled to appointed counsel in a termination proceeding, the case-law indicates that a

parent's indigency is a prerequisite to having the court appoint counsel. *Compare* I.C. § 31-32-4-3(a) *with In re Adoption of G.W.B.*, 776 N.E.2d at 954. In this case, Mother requested the appointment of counsel at the beginning of the consent hearing on the basis that she could not afford an attorney. The adoption court, however, made an initial determination that Mother had sufficient income and did not qualify for appointed counsel. After Stepmother rested her case-in-chief, Mother was unsure how to proceed with the presentation of her own evidence. Ultimately, the adoption court engaged in a significant examination of Mother, to which Stepmother objected. Without commenting on Mother's indigency, the adoption court—presumably in order to avoid the appearance that it was acting as Mother's advocate—determined that she was entitled to appointed counsel at that point and recessed the hearing.

[25] Although Mother did receive the benefit of counsel for her case-in-chief at the consent hearing and throughout the entirety of the subsequent hearing on the Child's best interests, Mother essentially contends that, had she been represented during Stepmother's case-in-chief at the consent hearing, her attorney could have explored certain inconsistencies in the testimony of Father and Stepmother through cross-examination, which might have impacted the adoption court's decision regarding the necessity of Mother's consent. *See* I.C. § 31-32-2-3(b)(1) (stipulating that in a termination proceeding, a parent is entitled to cross-examine witnesses). It is clear that the proceedings concerning Mother's consent, including the time that Mother was not represented, "flowed

directly" into the adoption court's ultimate decision to terminate Mother's parental rights through adoption. *In re G.P.*, 4 N.E.3d at 1169; *see* I.C. § 31-19-11-1(a)(1),(7) (requiring that adoption be in the child's best interest *and* that proper consent be given before an adoption petition is granted).

[26] The adoption court found that Mother had made a "voluntary choice" to proceed without the assistance of counsel. (Tr. Vol. II, p. 12). We disagree. Once Mother learned that she might be able to have court-appointed representation, she made it clear that she preferred to have the assistance of counsel rather than proceeding *pro se*. Despite its finding that Mother could afford an attorney, the adoption court, instead of offering an opportunity for Mother to secure a private attorney or encouraging her to do so, proceeded with the hearing on the basis that Mother had waived her right to counsel. As previously stated, a waiver of the right to counsel must be made "knowingly and voluntarily." I.C. § 31-32-5-5. Here, "nothing on the record demonstrates that the [adoption] court did anything to impress upon [Mother] the serious consequences [s]he faced if [s]he represented [herself]." *Taylor*, 570 N.E.2d at 1335.[3] Accordingly, because we find that Mother has established a *prima facie* case that she was deprived of an essential right in violation of due process, we must reverse the adoption court's adoption decree. We remand for a new hearing on the issue of Mother's consent, at which Mother should, absent a

---

[3] However, we do note that, based on the fact that Mother had previously retained counsel, it appears that she was informed of (or at least had knowledge of) her right to counsel.

knowing and voluntary waiver of her rights, be afforded the right to retain counsel or, if the adoption court determines that Mother is indigent, to appoint counsel on her behalf.[4]

# CONCLUSION

Based on the foregoing, we conclude that Mother's due process rights were violated by the adoption court's failure to, at the beginning of the consent hearing, either afford Mother with her right to counsel or otherwise ensure that Mother's waiver of the right to counsel was knowing and voluntary.

Reversed and remanded.

Crone, J. and Altice, J. concur

---

[4] Because we reverse on the basis that Mother was denied due process, we need not address Mother's additional arguments that the adoption court erred in finding that her consent was not required; that the home study was stale by the time of the final adoption hearing; and that the adoption court erred in failing to consolidate the paternity and adoption cases.