# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 17 2019, 8:41 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT J.L.

Michael B. Troemel
Lafayette, Indiana

ATTORNEY FOR APPELLANT S.B.

Steven Knecht
Vonderheide & Knecht, P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of D.J.S.L. (Minor Child) and J.L. (Father) and S.B. (Mother)

J.L. (Father) and S.B. (Mother),

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Plaintiff*

May 17, 2019

Court of Appeals Case No. 18A-JT-2630

Appeal from the Tippecanoe Superior Court

The Honorable Faith A. Graham, Judge

Trial Court Cause No. 79D03-1712-JT-132

**Vaidik, Chief Judge.**

# Case Summary

J.L. ("Father") and S.B. ("Mother") (collectively, "Parents") appeal the termination of their parental rights to D.J.S.L. ("Child"). We affirm.

# Facts and Procedural History

The undisputed facts are set forth in the trial court's order.[1] Child was born in July 2009 and suffers from autism, delayed speech, and a sensory-processing disorder. In May 2016, Parents and Child were living together in West Lafayette when the Indiana Department of Child Services (DCS) received a report alleging that Parents were using or manufacturing methamphetamine in their house and that Child's special needs were not being met. DCS workers went to the house to investigate and spoke with Mother. Mother claimed that she was not involved in manufacturing methamphetamine, that "the DEA showed up due to [Father] buying pseudoephedrine and manufacturing methamphetamine," and that she was "working with the DEA to help locate [Father]." DCS Ex. 1. Mother told DCS workers that she believed Father was "hiding from the police somewhere up north." *Id*. Child remained in Mother's care, and Family Case Manager (FCM) Casey Langston requested that Mother and Child submit to hair-follicle tests. Mother took Child for a hair-follicle test but did not submit to one herself. The result of Child's hair-follicle test showed

---

[1] Because neither Mother nor Father challenges the trial court's findings of fact, we accept them as true. *See Maldem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992).

that Child was positive for methamphetamine use or exposure. FCM Langston informed Mother of the positive result and required that Mother submit to a hair-follicle test in order for Child to remain in her care. Mother agreed to be tested but never actually completed a hair-follicle test.

[3] For the next two weeks, FCM Langston was unable to find Mother or Child. On June 8, DCS obtained a court order to take custody of Child when he was located. Two days later, FCM Langston spoke with Mother's doctor, who said that Mother called his office to let him know "that she is in the witness protection program living with a sheriff in Louisiana." *Id.* On June 15, DCS obtained Mother's address in Louisiana and arranged to take Child into custody. Louisiana's Department of Child and Family Services located Child, placed him in foster care, and learned that a criminal investigation had been opened due to Child being molested by one of Mother's neighbors in Louisiana. The neighbor, a registered sex offender, was arrested. On June 17, FCM Langston traveled to Louisiana and brought Child back to Indiana. The next day, he was placed in foster care.

[4] On June 20, DCS filed a petition alleging that Child was a child in need of services (CHINS). Father's whereabouts were unknown. In July, the court authorized DCS to serve Father by publication. In September, the court held a fact-finding hearing on the CHINS petition. Mother appeared by phone, and Father did not appear. Following the hearing, the court adjudicated Child a CHINS and issued a dispositional order requiring Parents to participate in

reunification services. Child remained in foster care. Mother stayed in Louisiana and intermittently participated in services there.

[5] In June 2017, Mother returned to Indiana and was referred to home-based case management, individual therapy, and supervised visitation. When Mother arrived in Indiana, she was homeless. Kaylynn Ranspach, a clinical therapist with Wabash Valley, assessed Mother and diagnosed her with major depressive disorder and generalized anxiety. Ranspach referred Mother to Jade Brack, a therapist at Wabash Valley, for individual therapy. Brack saw Mother once on July 17, 2017, and recommended that Mother attend biweekly counseling. Mother failed to show for any additional appointments. Then, from October to November, Mother was incarcerated for a previous charge, unrelated to the CHINS case. After she was released, Mother did not secure her own housing and stayed with friends in Lafayette and Attica.

[6] In December 2017, DCS filed a petition to terminate Parents' parental rights to Child. Father's whereabouts were still unknown. However, DCS had received information that Father was living in Natchitoches, Louisiana, and requested permission to serve him by publication. The court granted DCS's request, and DCS published notice three times in the Natchitoches Times. The notice stated that Father's termination hearing was scheduled for March 1, 2018. *See* Father's App. Vol. II p. 22 (notice of Father's termination hearing was published on December 30, 2017; January 6, 2018; and January 13, 2018).

[7] In January 2018, Mother began seeing Soledad Kardin-Smith, a therapist with Lifeline, for individual therapy to help with anxiety and depression. Sometime after Mother began attending therapy, she secured her own apartment in Crawfordsville. The trial court held a fact-finding hearing on DCS's termination petition on March 1, the date indicated in the published notice. At the hearing, the court emphasized that any evidence DCS wished to present "regarding [Father] must be concluded today." Tr. Vol. II p. 40. DCS called FCM Shalonda Haskins, who testified that DCS attempted to find Father using an investigator but that they were unable to locate him. FCM Haskins stated that she contacted Father's relatives, and none of his relatives had seen or talked to him. FCM Haskins explained that because DCS did not have valid contact information for Father, DCS served Father by publication in the underlying CHINS case and in the termination proceeding. FCM Haskins said that Father had not completed or engaged in any services and that he had not visited Child since Child was removed from Parents' care in June 2016. FCM Haskins testified that she believed Father would be a threat to Child because Father has "been accused of producing meth in a home where [Child] was residing." *Id*. at 69. FCM Haskins stated that termination of Father's parental rights is in Child's best interests because Father "has not demonstrated the ability to care for his son, to protect his son, to provide an environment that would be safe for his son." *Id*. at 70. FCM Haskins said that DCS's plan is for Child to be adopted. Due to time constraints, the fact-finding hearing was continued to hear evidence regarding Mother.

[8]     The fact-finding hearing resumed on May 25, and Father appeared in the custody of the Tippecanoe County Sheriff. Father had been arrested on May 15 and was in custody awaiting trial for criminal charges in Montgomery County. *See* 54D01-1805-F6-1292. Father explained to the court that he had never appeared at any hearing whatsoever. The court advised Father of his rights in a termination proceeding, including the right to an attorney, and explained that DCS had presented evidence against him on the first day of the fact-finding hearing. Father then requested to be represented by an attorney. The court explained:

> [G]iven where we are in this stage the Court is considering appointing perhaps a standby counsel to give you at least a little bit of advice. . . . And the status of the circumstances related to having already been served notice and . . . having heard the testimony in your absence and default judgment potentially entered with regard to your absence here, because we haven't heard from you at all in the CHINS case, so I don't know what your intention is. . . . So what I am inclined to do is perhaps appoint[] counsel to at least give you a bit of advice about where you stand legally and then see if that counsel has any particular motions. . . . So, I'm happy to find an attorney to at least give you a little bit of advice before we resume back with further testimony. Is that [what] you'd like the Court to do?

Tr. Vol. II pp. 86-87. Father agreed, and the court appointed attorney Ladona Sorenson as Father's "standby counsel." After conferring with Father for thirty minutes, Attorney Sorenson told the court that Father's understanding was that his parental rights had been already terminated, which is why he had not appeared before that day. Attorney Sorenson moved to continue the hearing so

that she could review the case. DCS and Child's Court Appointed Special Advocate (CASA) objected to a continuance. After some discussion, Attorney Sorenson told the court, "Your honor, my client has indicated that he wants me to withdraw that request for a continuance and to just proceed today as scheduled." *Id*. at 92. The court asked Father if he wished to proceed that day, and Father said yes. *See id*. at 93.

[9] The court then proceeded to hear evidence, and DCS called Erica Eades, a case-manager from Arisings, which provided supervised visitation for Mother and Child. Eades testified that in the last month Mother had started to turn things around but her biggest concern is "making sure that [Mother] can maintain housing long-term." *Id*. at 138. Desiree Brown, one of Mother's other visitation providers, also testified that Mother had lived at five different places since she began working with her. Dottis Rausch, Child's CASA, testified that Mother "has recently started engaging in services and taking more action to address her mental health needs." *Id*. at 187-88. However, CASA Rausch stated that she recommended termination of parental rights and adoption because Mother had not demonstrated long-term stability and had not fully addressed her mental-health issues. CASA Rausch said that she had not had any contact with Father. FCM Haskins also testified that termination of Mother's parental rights is in Child's best interests. *See id*. at 239. Father testified that he was still married to Mother and did not want to testify against her. Father acknowledged that when he was living in Natchitoches, Louisiana, he had received a notification that DCS had sent him some certified mail but

said that he "never went and bothered to pick it up" from the post office. *Id*. at 199. Regarding his absence from the termination proceedings, Father said that he did not appear because Mother told him that Child was in foster care and that his parental rights had already been terminated. In September 2018, the court issued its order terminating Parents' parental rights.

[10] Father and Mother separately appeal.

# Discussion and Decision

[11] Parents make two separate arguments on appeal. Father argues that the trial court erred by not appointing him counsel, and Mother argues that the termination of her parental rights is not in Child's best interests.

## I. Appointment of Counsel

[12] Father contends that the trial court erred by not appointing him counsel. Specifically, he argues that "he should have been appointed a lawyer to represent him, and not given a 'standby lawyer' to advise him 'a little bit.'" Father's Br. p. 11.

[13] Indiana's law governing juvenile-court procedures provides that "[a] parent is entitled to representation by counsel in proceedings to terminate the parent-child relationship." Ind. Code § 31-32-2-5; *see also* Ind. Code § 31-32-4-1(2). Because a parent has a fundamental liberty interest in the care and custody of his or her child, we have held it is a due-process violation to remove a child from an indigent parent "without affording that parent the right to assistance of

court-appointed counsel." *In re C.J.*, 71 N.E.3d 436, 442 (Ind. Ct. App. 2017). Therefore, a juvenile court has an obligation to appoint counsel to an indigent parent unless that parent knowingly and voluntarily waives the right to counsel. Ind. Code § 31-32-4-3(2).

[14] Here, once Father requested an attorney, the trial court located Attorney Sorenson, who conferred with Father for thirty minutes and then requested a continuance because she knew very little about the case and was not prepared to proceed with the hearing that day. *See* Tr. Vol. II p. 89. After some discussion regarding Father's request for a continuance, Attorney Sorenson told the court, "Your Honor, my client has indicated that he wants me to withdraw that request for a continuance and to just proceed today as scheduled." *Id.* at 92. The trial court then confirmed with Father that he did in fact want to proceed that day. Father said yes. *See id.* at 93.

[15] Father's withdrawal of his request for a continuance was fatal to his request for counsel. That is, no attorney could have adequately represented him on the spot or done anything more than what his "standby counsel" did. A continuance would have been necessary to fulfill Father's request for counsel. Therefore, when Father withdrew his request for a continuance and told the court that he wished to proceed with the termination fact-finding hearing that day, he necessarily withdrew his request for "counsel" as opposed to "standby counsel." Accordingly, Father cannot now be heard to argue that the trial court erred by failing to appoint "counsel."

# II. Child's Best Interests

When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id*. When a trial court has entered findings of fact and conclusions, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id*. To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence supports the trial court's findings and whether the findings support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d at 1231. If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[18] Mother only challenges the trial court's conclusion that termination is in Child's best interests. To determine what is in child's best interests, the trial court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. In doing so, the trial court must subordinate the interests of the parent to those of the child. *Id*. We have previously held that recommendations by both the DCS case manager and the CASA to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is clear and convincing evidence that termination is in the best interests of the child. *Id*. at 1158-59.

[19] Mother contends that by the time of the fact-finding hearing, she had "presented evidence of a clean, suitable home; the ability to pay her living expenses; and excellent engagement in services." Mother's Br. pp. 18-19. Mother states that it is not in Child's best interests "to remove his mother from his life." *Id*. at 19. Mother, however, does not dispute the court's conclusion that the conditions that resulted in removal of Child will not be remedied because she has not "demonstrated the ability or willingness to make **lasting** changes from past behaviors." Mother's App. Vol. II p. 16 (emphasis added).

While it is true that Mother recently started attending counseling and moved into an apartment, the trial court found that "Mother's recent engagement in services does not overcome Mother's historical pattern of failing to address mental health and instability needs." Mother's App. Vol. II p. 15 (Finding 18). Indeed, the trial court was well within its discretion to disregard the efforts Mother made only shortly before termination and to weigh more heavily her history of conduct before those efforts. *See In re A.W.*, 62 N.E.3d 1267, 1273 (Ind. Ct. App. 2016) ("Trial courts have discretion to weigh a parent's history more heavily than efforts made shortly before termination, and the court may find that a parent's past behavior is the best predictor of future behavior."). Moreover, both FCM Haskins and CASA Rausch testified that termination of Mother's parental rights is in Child's best interests. *See* Tr. Vol. II pp. 190, 239. As such, the trial court did not err when it concluded that termination is in Child's best interests.

[20] Affirmed.

Kirsch, J., and Altice, J., concur.