## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 31 2020, 10:04 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Cara Schaefer Wieneke
Brooklyn, Indiana

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

Ta.B., J.B., & Ty.B. (Minor Children)

and

C.B. (Mother) and J.B., Sr. (Father)

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

July 31, 2020

Court of Appeals Case No. 19A-JT-678

Appeal from the Vigo Circuit Court

The Honorable Sarah K. Mullican, Judge

Trial Court Cause Nos. 84C01-1804-JT-371, 84C01-1804-JT-372, 84C01-1804-JT-373

**Altice, Judge.**

## Case Summary

C.B. (Mother) and J.B. (Father) (collectively, Parents) separately appeal from the involuntary termination of their parental rights to their three minor children. This appeal, as well as the underlying trial proceedings, has been unnecessarily prolonged, and we are loath to cause additional delay. Parents, however, are entitled to due process, which they did not receive below due to a myriad of errors.

We reverse and remand.

## Facts & Procedural History

Mother and Father are married and have three children together, Ta.B., J.B., and Ty.B. The children are now ages sixteen, thirteen, and eleven, respectively. The Indiana Department of Child Services (DCS) became involved with the family in October 2011, after the family moved to Indiana from Kentucky.

After arrival in Indiana, it was discovered that Ta.B. had been the victim of sexual abuse by two adult cousins while living in Kentucky. By the age of eight, Ta.B. began acting out sexually toward her siblings and was aggressive with other children and adults too. DCS worked with the family to develop a safety plan, and Ta.B. began seeing a behavioral therapist. DCS eventually determined that Parents were not adequately responding to the dire situation, so DCS filed a CHINS petition in April 2012. Following a contested factfinding

hearing, the trial court adjudicated the children CHINS in September 2012. The CHINS order provided in part:

> [Mother and Father] acknowledge that the actions of their oldest daughter, [Ta.B.], manifest serious psychological problems with [Ta.B.] and endanger the safety and well-being of her younger siblings, [J.B. and Ty.B.]. The real dispute by the parents is the [S]tate's allegation that the parents have in any way been neglectful in performing their parental duties so as to justify the coercive intervention of the court into their lives.

> The court believes that judging the promptness of a parent's reaction to a child's needs requires the court to consider the urgency of the specific situation…. Where, as here, a young child is repeatedly subjecting her younger siblings to serious sexual abuse, no action by a parent can be too quick. In this case, the delay in getting [Ta.B.] into intensive therapy …, combined with the failure to prevent repeated occurrences of abuse in the interim, do constitute a neglect of the children's parents to supply them with the necessary treatment and rehabilitation that they needed and created a life and health-endangering environment….

> Fortunately, the parents have otherwise been reasonably cooperative with DCS in getting services into the home. But immediate, intensive therapy for [Ta.B.] and her separation from the younger children in the meantime are imperative.

*Exhibit Vol. IV* at 77-78. J.B. and Ty.B. remained in the home with Parents, and Ta.B. was placed at Gibault, a residential treatment facility.

Mother and Father complied with the case plan by visiting Ta.B. at Gibault and participating in homebased services, random drug screens, and family

counseling. By November 2013, the CHINS cases relating to J.B. and Ty.B. were closed. Ta.B.'s remained open.

[6]     At some point, Father began struggling with a drug addiction, which lead to arrests and charges in March and May 2014. He was in jail from May 17, 2014 through June 13, 2014, when he was released on bond. In April 2015, Father pled guilty to, among other things, Class D felony possession of methamphetamine and received a two-year suspended sentence. After a brief period of sobriety, Father relapsed and violated his probation several times in late 2015 and 2016, resulting in several periods of incarceration.[1]

[7]     In the meantime, Ta.B. returned to Mother's care on May 30, 2014, for a trial home visit (THV) with intensive wraparound services. Mother fully complied with services, but Ta.B. continued to run away and act out. The THV ended in October 2014 when Ta.B. was placed in the Evansville Psychiatric Children's Center in order to receive more restrictive and intensive treatment. Ta.B. was diagnosed with oppositional defiant disorder, ADHD, and anxiety and prescribed several daily medications.

[8]     In July 2015, Ta.B. graduated from the program at the Evansville Psychiatric Children's Center and returned to Parents' home for another THV. Father had

---

[1] Father was arrested on new drug charges in January 2017 and forgery and theft charges in April 2018, and he had probation revoked in July 2018.

agreed to go into residential treatment for his drug abuse, but he did not complete treatment.

[9] On August 25, 2015, due to Father's continued use of methamphetamine and other illegal drugs, DCS filed new CHINS petitions involving Ty.B. and J.B. Shortly thereafter, Mother and Father admitted the allegations. To ensure the safety of the children, Father was removed from the family home until he could successfully complete an addictions program. All three children remained in Mother's care, and Father was not allowed to be with them unsupervised. Thereafter, while Father continued to struggle with drug abuse and related incarcerations, Mother engaged in services and improved her ability to parent.

[10] On March 14, 2016, after Father had been out of jail for about a month, DCS filed an information for rule to show cause, alleging that Mother and Father had not complied with the safety plan. Specifically, Mother had permitted Father in the family home, Father had not completed an addictions program, and Father had unsupervised contact with the children. Around this time, service providers noted a decline in overall family function, including an increase in Ta.B.'s negative behaviors and a decline in Mother's parenting.

[11] While the contempt hearing was pending, the children were removed from Mother's home on an emergency basis on March 22, 2016. The court held a detention hearing two days later and returned Ty.B. and J.B. to Mother's care. Ta.B. remained outside the home, placed in kinship care and, when that failed,

the Wellstone Hospital awaiting placement at Wernle Children's Home.[2] The contempt hearing was dismissed.

[12] Following another information for rule to show cause filed in June 2016, Father was found in contempt for continuing to use methamphetamine and for violating the safety plan on multiple occasions. The court did not find Mother in contempt, noting that she had complied with the court's orders. By this time, Father was incarcerated again.

[13] After his release from incarceration in August 2016, Father asked the court to allow him to live in the family home again with Mother and Ty.B. and J.B. The trial court denied his request until Father could demonstrate a reasonable period of sobriety and compliance with court-ordered services. The very next day, Father was discovered alone in the home with Ty.B. and J.B., while under the influence of methamphetamine.

[14] By January 2017, DCS began recommending removal of Ty.B. and J.B. from Mother's home, as her compliance with services had diminished, Ty.B. and J.B. continued to have unsupervised contact with Father who lived down the road (when not incarcerated), the children lacked appropriate supervision in general, and Ta.B. was demonstrating a great deal of behavioral and emotional issues in

---

[2] Ta.B. was placed at Wernle by October 2016, in a program that specializes in sexually maladaptive youth.

the home and at school.[3] Providers believed that Ty.B.'s issues stemmed from past trauma but that the lack of structure and supervision in the home contributed to the ongoing nature of the issues. Following a review hearing on February 2, 2017, the court found that Mother and Father were not in compliance with the case plan but denied DCS's oral motion for placement of Ty.B. and J.B. in therapeutic foster care because no formal written motion had been filed.

[15] Shortly thereafter, on February 11, 2017, Mother was arrested following a physical altercation with an adult relative. Father was also incarcerated at the time. Ty.B. and J.B. were taken into emergency custody by DCS and were placed together in foster care. They have never been returned to Mother's care. After Ty.B. ran away from the foster home in October 2017, she and J.B. were moved to separate residential facilities, and J.B. was later placed in a therapeutic foster home. Ty.B. has remained in treatment facilities, as she suffers from many of the same behavioral and emotional issues as Ta.B.

[16] Following a review hearing on January 4, 2018, the court found that Mother and Father had not complied with the case plan and, on DCS's motion, changed the permanency plan to termination of parental rights and adoption. Accordingly, on April 19, 2018, DCS filed the instant petitions for the involuntary termination of parental rights. In the CHINS proceedings, on May

---

[3] In the progress report filed in January, DCS provided a detailed list of reasons why removal was recommended. In addition to those mentioned above, DCS addressed financial and housing concerns.

9, 2018, DCS filed a motion to modify the dispositional decree to stop all services to the parents, including visitation. Along with the motion, DCS filed a detailed modification report that noted, in part, that Father was once again incarcerated, Father continued to use methamphetamine, Parents were facing eviction from their apartment, and they had not been compliant with services "for the better part of the past 8 months and partially compliant throughout the life of the (5.5 years) case." *Exhibits Vol. VI* at 19.

[17] The trial court held a combined hearing in the termination of parental rights (TPR) and CHINS cases on May 15, 2018. Regarding the initial hearing for the TPR cases, the court asked the parents if they had received the TPR petitions and if they would like to have attorneys represent them. The parents responded affirmatively to both questions, and the court indicated that attorneys would be appointed for them[4] and set the factfinding hearing for August 13, 2018. The court then turned to the CHINS matter and heard evidence regarding the motion to modify. Based on the evidence presented, the court granted the motion and ended all services for parents, including visitation.

[18] On August 13, 2018, the TPR factfinding hearing commenced.[5] At the beginning of the hearing, Father, who was in prison and had not been

---

[4] Indigent counsel was appointed for Mother and Father on May 18, 2018, and their respective counsel entered an appearance that day – Steven Cuvelier for Mother and Jeffrey Kohr for Father. These attorneys had also represented them during the later portion of the CHINS proceedings.

[5] While we have set out many facts leading up the filing of the TPR petitions, we will not go into detail regarding the extensive evidence presented at the TPR hearing or the trial court's findings of fact. Rather, because our reversal is based on procedural grounds, the procedural facts remain our focus.

transported, indicated that he wished to be present in person, could not hear well, and had not been able to speak with his attorney. After a lengthy discussion with counsel, the trial court denied Father's request for a continuance and determined that Father's rights could be protected by "allowing him to participate by phone with his counsel being present and a chance to confer" privately with counsel over the phone. *Transcript Vol. I* at 47. During the testimony of the second witness, Father asked to speak with his attorney and was permitted to do so. Thereafter, counsel renewed the request for a continuance to "allow [Father] an opportunity to hand me notes and to communicate immediately with me." *Id*. at 73. The court denied the request. In all, ten DCS witnesses testified that day. The court scheduled the hearing to resume on October 29, 2018, noting "we will have [Father] definitely transported here." *Id*. at 160.

[19] Father was transported for the hearing on October 29, 2019. To the surprise of her attorney and the court, Mother indicated at the beginning of the hearing, after speaking with Father, that she wished to fire Attorney Cuvelier. The court asked Mother if she wished to proceed with no counsel, and Mother responded, "I wouldn't have none but I need to have new counsel." *Id*. at 165. The following discussion ensued:

> THE COURT: Alright. Well here's the thing. By law we have to proceed with the proceedings so if you wish to proceed on your own Ma'am you certainly have that right to do that. If you want to proceed with the assistance of Mr. Cuvelier you can do that. Let the record show that [Parents] are consulting with one another about the issue. So how do you wish to proceed?

[MOTHER]: Um I need a new representative, I need somebody else to represent me because he hasn't consulted with me very much at all.

THE COURT: Well we got to get this concluded by law I've got to get this moving. So if you want Mr. Cuvelier to be relieved I can relieve him but that will effectively leave you without representation unless you just want to rely on your husband's attorney but he really can't technically represent you. Your interest [sic] very possibly conflict.

[MOTHER]: Can [Father] explain my situation?

THE COURT: You want your husband to act as your counsel in this matter at this time?

[FATHER]: Just to help her explain why she wants a different attorney.

THE COURT: Is it why she wants a different attorney or why you want her to have a different attorney?

[FATHER]: I don't I mean he's her attorney and is supposed to be for her. Well he sits up here and makes a fool out of her, telling her you ain't got the money how are you going to pay for housing? I mean this is all in documentation. The documents are in the file.

THE COURT: Mr. Cuvelier we are going to show you withdrawn.

*Id*. at 166-67. The hearing proceeded with Mother representing herself.

[20]  DCS called four additional witnesses and rested its case late that afternoon. The court acknowledged that Mother and Father would likely need more time to present their case. Additionally, Father and Mother both expressed a desire to call Ta.B. as a witness, to which DCS objected. The court directed the parties to make written filings on the issue of Ta.B. testifying. After Father briefly testified, the trial court set the hearing to continue to December 3, 2018.

[21]  On November 2, 2018, Father filed a motion for inclusion of witness, and DCS responded with a written objection to request to have child available for testimony.[6] The court scheduled a hearing on the issue of Ta.B. testifying for November 27, 2018. Mother was not notified of this hearing and, thus, not present, and Father was not transported for the hearing, though he was represented by counsel. At the hearing, DCS presented brief testimony from Ta.B.'s therapist and the family case manager. Both opined that testifying would be traumatic for Ta.B. and could cause a regression in her progress and not be in her best interests. CASA Rachel Cox also expressed opposition to Ta.B. testifying in court. After initially ruling that Ta.B. would be excluded from testifying, the trial court reversed course later that same day. The court indicated that Parents have a right to call Ta.B. to testify and that if DCS wished to use videotaped testimony instead of live testimony, DCS had the

---

[6]  In its objection, DCS argued, in part, that if the court were to overrule the objection and allow testimony from Ta.B., "there are less harmful ways for that to be accomplished, including but not limited to testimony via child hearsay, video taped testimony or closed circuit testimony where a medical professional could be present, or in-camera." *Appendix Vol. 2* at 64.

burden of making the showing required by Ind. Cod § 31-35-4-3.[7] DCS then noted that it would need a continuance in order to conduct a child hearsay evaluation.[8] The trial court indicated that the TPR factfinding hearing would continue as scheduled but acknowledged that DCS would not be required to bring Ta.B. to that hearing because DCS still needed time for a child hearsay evaluation.

[22] On November 28, 2018, DCS filed a written request for the trial court to conduct an *in camera* interview of Ta.B. in lieu of testimony in court. That same day, the trial court issued an order denying the request.

[23] On December 3, 2018, Mother appeared for the third day of the scheduled factfinding hearing. Father was not transported from prison, despite the issuance of a transport order, so the court reset the hearing for February 11, 2019. Prior to the rescheduled hearing date, Mother filed a request for appointment of counsel. Attorney Cuvelier was reappointed as Mother's attorney at the end of January. Additionally, on January 30, 2019, DCS filed a notice of witness unavailability, which indicated that Ta.B. "will not be

---

[7] This statute sets out specific requirements for admission of a child's videotaped testimony at a TPR hearing.

[8] This appears to be in reference to I.C. § 31-35-4-3(2)(C)(i) as a basis to submit reliable videotaped testimony where the court finds that the child is unavailable because "a psychiatrist, physician, or psychologist has certified that the child's participation in the proceeding creates a substantial likelihood of emotional or mental harm to the child." Additionally, however, we note I.C. § 31-35-4-2(1)(B)'s further limitation on the admissibility, under this chapter, of videotaped testimony of a child between the ages of fourteen and eighteen years of age. With respect to such older children, the proponent of the videotape must establish that the child "has a disability attributable to an impairment of general intellectual functioning or adaptive behavior." *Id.*

available for testimony on 2/11 for Fact Finding for the reason that her hearsay evaluation is scheduled for 2/20 to determine if video testimony is appropriate." *Appendix Vol. 2* at 76.

[24] At the factfinding hearing on February 11, 2019, Father testified, followed by Mother. Father's counsel then indicated that Ta.B.'s testimony was still needed after the upcoming hearsay evaluation. Attorney Cuvelier, on behalf of Mother, asked for an additional hearing since he had just been put back on the case and there were witnesses that he would still like to call. DCS objected to additional testimony and noted that "anyone else besides the child [] could have been subpoenaed … here today." *Transcript Vol. II* at 95. The trial court took "the request for an additional day of evidence under advisement." *Id*. at 96.

[25] Three days later, on February 14, 2019, the trial court issued orders involuntarily terminating the parental rights of Mother and Father to Ta.B., Ty.B., and J.B. In its orders, the trial court indicated that it had denied the requested continuance of the factfinding hearing as not being made in good faith, noting that Father had not subpoenaed Ta.B. or any other witness after DCS concluded their presentation of evidence more than three months earlier.

[26] Mother and Father filed motions for a belated appeal, which were granted by this court, respectively, on March 28 and April 2, 2019. After protracted proceedings to obtain the transcript and exhibit volumes from the Vigo Circuit and Superior Courts Clerk, a third amended notice of completion of transcript was filed on August 26, 2019.

[27] Resulting in further delay in this appeal, on September 24, 2019, Mother and Father filed a joint emergency petition to stay the appellate deadlines and remand to the trial court pursuant to Ind. Appellate Rules 31 and 32 to allow for reconstruction and/or correction of the record. This court granted the motion on October 2, 2019.

[28] Mother and Father then filed a joint statement of the evidence, consisting of verified statements from Mother, her appellate counsel, and Attorney Cuvelier. Mother averred that she represented herself from October 29, 2018 to January 28, 2019 and did not appear at the November 27, 2018 hearing (the November Hearing) because she did not receive notice. Additionally, Mother indicated that she had hoped to present evidence at the hearing on February 11, 2019 but was never contacted by Attorney Cuvelier after his reappointment. Attorney Cuvelier's statement indicated that he did not receive notice of the November Hearing and that he did not contact her after his reappointment and before the February hearing. Mother's appellate counsel, Kimberly Jackson, indicated in her verified statement that she had recently contacted the Vigo County Clerks office to investigate whether notice of the November Hearing had been sent to Mother. Attorney Jackson was informed that "orders in [TPR] cases in Vigo County are served by [DCS], rather than the Vigo County Clerk, due to the frequent address changes of parents involved in such proceedings." *Appendix Vol. 2* at 164. DCS filed an unverified response, which was later stricken by the trial court.

[29] Magistrate Daniel Kelly, who presided over the TPR proceedings, issued an affidavit on December 2, 2019 (the Magistrate's Affidavit). Some of the statements in the Magistrate's Affidavit were in direct conflict with the existing undisputed record. Moreover, the Magistrate's Affidavit did not resolve the primary question on remand regarding whether notice of the November Hearing was sent to Mother. As a result, on December 5, 2019, Parents filed with the trial court a joint motion for clarification. Among other things, they sought clarification on whether:

> a) DCS, rather than the Vigo County Clerk, serves copies of the Court's orders on parents in termination of parental rights cases in Vigo County;
>
> b) Mother actually was served notice of the [November Hearing], given the representations of the Vigo County Clerk's office that it does not serve such orders on parents, the lack of any evidence in the docket or elsewhere that DCS or any other entity served her by mail or in any other manner, and DCS's failure to deny that it is responsible for serving such orders in Vigo County;
>
> c) Mother received automatic email service as DCS seems to hint (which appears impossible as Mother's email is not listed in Odyssey and the Odyssey notice does not reflect email service to her).

*Id*. at 184.

[30] On December 27, 2019, this court ordered the trial court to rule on the pending motion, and the trial court issued a clarification order on December 31, 2019.

In its order, the trial court corrected certain misstatements – but not others – in the Magistrate's Affidavit. Regarding the notice issue, the court stated that it had "no evidence that Mother was served with notice of the [November Hearing], which was solely on Father's request to be allowed to subpoena Ta.B. issue [sic] to testify[,]" and "no evidence that the order setting that hearing or the ruling thereon was served upon Mother." *Id*. at 188.

[31] On January 10, 2020, Parents filed yet another motion asking this court to require a statement from the trial court and DCS as to the historical and present service procedures in TPR cases. They acknowledged that the trial court's clarification order resolved the issue regarding whether Mother received notice of the November Hearing – she did not – but they urged that the clarification order did not resolve the question of how parents are being served with orders in TPR cases in Vigo County. DCS filed an objection to the motion, arguing that Parents were seeking information not related to this appeal. In response, Parents then filed a motion for verified statement from the Vigo County Clerk.

[32] On January 31, 2020, this court issued an order holding in abeyance for the writing panel the pending motions for verified statements from DCS, the trial court, and the Vigo County clerk.[9] Parents were directed to file their appellate briefs within ten days of the order.

---

[9] In an order issued today, we deny the pending motions because the information sought is unnecessary for our resolution of this case and further delay is not warranted.

[33] On February 3, 2020, Parents filed a motion to reconsider our order, which was denied. They also contemporaneously filed with the trial court another lengthy joint motion for correction of the clerk's record and transcript, arguing, in part, that the court "never established in the App. R. 31 proceedings the service procedures in effect at all relevant times in this and other [TPR] cases including whether DCS or the Vigo County Clerk's Office was responsible for serving orders on parents in [TPR] cases." *Id.* at 192. On March 25, 2020, the trial court denied the motion.

[34] Mother and Father each filed their respective appellant's brief on February 27, 2020, more than a year after their parental rights were terminated by the trial court. DCS filed a consolidated appellee's brief on April 15, 2020, which was timely filed pursuant to extensions related to the COVID-19 crisis. Mother and Father filed reply briefs on April 30, 2020.

## Discussion & Decision

[35] It is well recognized that a parent's interest in the care, custody, and control of his or her children is perhaps the oldest of the fundamental liberty interests. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016); *see also In re Adoption of O.R.*, 16 N.E.3d 965, 972 (Ind. 2014) (noting that the Fourteenth Amendment to the United States Constitution protects the rights of parents to establish a home and raise their children, that parents have a fundamental liberty interest in the care, custody, and control of their children, and that the parent-child relationship is one of the most valued relationships in our culture). Thus, when the State seeks

the involuntary termination of a parent-child relationship, it must do so in a manner that meets the requirements of due process. *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011).

[36] Due process embodies the idea of fundamental fairness and requires the "opportunity to be heard at a meaningful time and in a meaningful manner." *Id*. (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). Due process in parental rights cases involves the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing government interest supporting the use of the challenged procedure. *Id*. Because a parent's private interest and the State's interest are both substantial in termination proceedings, our focus generally falls on the risk of error created by DCS's actions and the trial court's actions. *See id.* at 917-18; *S.L. v. Indiana Dep't of Child Servs.*, 997 N.E.2d 1114, 1120 (Ind. Ct. App. 2013).

[37] Further, we recognize "the general principle that 'if the State imparts a due process right, then it must give that right.'" *In re C.G.*, 954 N.E.2d at 917 (quoting *A.P. v. Porter Cty. Office of Family & Children*, 734 N.E.2d 1107, 1112 (Ind. Ct. App. 2000), *trans. denied*). A parent in a TPR proceeding is statutorily entitled to (1) cross-examine witnesses, (2) obtain witnesses or tangible evidence by compulsory process, and (3) introduce evidence on behalf of the parent. Ind. Code § 31-32-2-3(b). A parent is also entitled to representation by counsel in proceedings to terminate the parent-child relationship. I.C. § 31-32-2-5; *see also* I.C. § 31-32-4-1(2). Further, I.C. § 31-32-4-3(a) requires the appointment of

counsel in such proceedings if the parent "does not have an attorney who may represent the parent without a conflict of interest" and "has not lawfully waived the parent's right to counsel."

[38] On appeal, Parents individually and collectively raise a number of alleged due process violations. We need only address a select few in order to determine that they are entitled to reversal.

[39] First, we address Mother's claim that she was denied her right to counsel. DCS does not dispute that Mother had a right to appointed counsel, but it claims that she "knowingly and voluntarily waived her right to counsel and chose to represent herself when she fired her attorney in the middle of the termination proceedings." *Appellee's Brief* at 28. We cannot agree.

[40] The right to counsel in a termination proceeding may only be waived "if the parent does so knowingly and voluntarily." I.C. § 31-32-5-5. Here, although the trial court appointed counsel at the initial hearing, the record reveals that the court did not advise Mother of her right to counsel[10] (or any of her other rights). Then when Mother expressed a desire for new counsel on the second day of the factfinding hearing, the trial court did not clearly explain to Mother that she had to choose between being represented by Attorney Cuvelier or proceeding pro se. More importantly, the trial court failed to make any attempt to impress

---

[10] Parents whose rights are being involuntarily terminated have the right to be represented by counsel, the right to have counsel provided if they cannot afford private representation, and the right to be informed of the two preceding rights. *In re Adoption of G.W.B.*, 776 N.E.2d 952, 954 (Ind. Ct. App. 2002).

upon her the serious consequences she faced if she represented herself.[11]  Under the circumstances, we conclude that Mother was denied her right to counsel when the trial court failed to obtain a knowing and voluntary waiver from her before allowing Attorney Cuvelier to withdraw.  *See Matter of Adoption of C.J.*, 71 N.E.3d 436, 444 (Ind. Ct. App. 2017) (reversing where mother established a prima facie case that she was deprived of an essential right – the right to counsel – in violation of due process); *In re Adoption of G.W.B.*, 776 N.E.2d at 954 (reversing where trial court did not advise father of his rights and did not impress upon him the serious consequences of self-representation); *Taylor v. Scott*, 570 N.E.2d 1333, 1335 (Ind. Ct. App. 1991) (reversing where father was not informed of his right to counsel, not warned that he might have to proceed without counsel if his attorney withdrew, and, "most importantly, nothing on the record demonstrate[d] that the trial court did anything to impress upon [him] the serious consequences he faced if he represented himself"), *trans. denied*.

[41]    In this case, deadlines, advisements, and notice were also apparent issues.  The initial hearing in the TPR proceedings was almost nonexistent.  The order issued following the initial hearing curiously indicates that the court "advise[d] [Parents] of the material allegations of the petitions, the rights of the parent(s) and children, and the right to be represented by counsel."  *Appendix Vol. 2* at 58.

---

[11] In the Magistrate's Affidavit, the trial court averred that it cautioned Mother about the dangers of proceeding without counsel.  The transcript of the hearing plainly indicates otherwise.

The transcript, however, reveals that Parents were not so advised. The sum total of the initial hearing follows:

> THE COURT: Alright. Thank you. Did the have the parents received a copy of the [TPR petitions]. Did you guys get that paperwork.
>
> [MOTHER]: Yeah I don't have it with me but…
>
> THE COURT: But you've seen what they are asking for?
>
> [MOTHER]: Yes.
>
> THE COURT: Alright. Would you guys like to have attorneys represent you in that?
>
> [FATHER]: Yes.
>
> THE COURT: Alright. We will go ahead and show attorneys appointed for the termination cause and set a Fact Finding Hearing for that. And then after we get that set we can hear testimony on the pending motions in the CHINS cases.
>
> [DCS]: And also will you appoint a CASA on the TPR case?
>
> THE COURT: I'm sorry.
>
> [DCS]: A CASA would also be appointed in the TPR cause number?
>
> THE COURT: Yes and yes. And we already have a CASA on the CHINS case as well.

CT. REPORTER: August 13th at 9:00 o'clock.

THE COURT: Okay we will write that down[.]

*Transcript at Vol. I* at 4-5.

[42] In addition to not advising Parents of their rights, the court set the date for the factfinding hearing with no apparent concern for the statutory requirement that the hearing commence "not more than ninety (90) days after a petition is filed." Ind. Code § 31-35-2-6(a)(1). The court scheduled the hearing to begin 116 days after the TPR petitions were filed. Additionally, after the first day of evidence, the court set the continued factfinding hearing beyond the 180-day deadline for completing the hearing, as set out in I.C. § 31-35-2-6(a)(2). We acknowledge that Parents did not object to these dates and did not file motions to dismiss when the hearing was not held within the statutory timeframes, as would be their right under subsection (b) of the statute. While they are therefore not entitled to reversal on this ground, we certainly find the trial court's disregard of the statutory deadlines concerning. *See Matter of J.S.*, 133 N.E.3d 707, 713 (Ind. Ct. App. 2019) ("A party must preserve the right of expediency by filing a written motion to dismiss before the merits of a petition are litigated.").

[43] Next, we address Parents' claim that they were precluded from presenting evidence on their own behalf, particularly the testimony of Ta.B. As set forth above, parents in a TPR proceeding are statutorily entitled to, among other things, obtain witnesses by compulsory process and introduce evidence. I.C. § 31-32-2-3(b).

[44] Here, Parents made clear their desire to call Ta.B., who was in the custody of DCS. They both made this request orally at the factfinding hearing in October, and a few days later, at the direction of the court, Father filed a written motion to have Ta.B. testify. At the November Hearing on this contested issue, the court ultimately ruled that Parents had the right to call Ta.B. as a witness and that if DCS desired an alternate means of obtaining her testimony (i.e., videotaped testimony), it was DCS's responsibility to establish the statutory requirements. DCS indicated it would take time to conduct the child hearsay evaluation and, therefore, Ta.B. would not be available for the next scheduled factfinding hearing. The trial court agreed that Ta.B.'s testimony could wait until after the child hearsay evaluation was conducted. Prior to the February 11 factfinding hearing, DCS filed a written notice that Ta.B. would not be available for the hearing because her evaluation was scheduled for February 20 "to determine if video testimony is appropriate." *Appendix Vol. 2* at 76. Accordingly, Parents presented evidence on February 11, 2019, with the reasonable belief that Ta.B.'s testimony would be obtained after her evaluation.

[45] Three days later, and six days before the child hearsay evaluation, the trial court suddenly issued orders terminating Mother's and Father's parental rights. The trial court ruled that it would not allow Parents to present additional evidence, including the testimony of Ta.B., because they did not subpoena any witnesses. This strikes us as fundamentally unfair. Ta.B. was in the custody of DCS at all times, DCS was fully aware of Parents' desire to call her as a witness, and DCS informed Parents and the court that she would not yet be available due to the

upcoming child hearsay evaluation.  The trial court violated due process when it cut Parents' evidence short in this regard.

[46] Finally, we share Parents' concerns with regard to the failure to transport Father[12] on several occasions and the lack of notice provided to Mother for the November Hearing and resulting order, among potentially other notice issues raised by Parents in their several motions filed with this court and the trial court throughout this appeal.[13]  We need not determine whether these issues amount to a violation of due process, however, because other violations discussed above clearly entitle Parents to reversal.

[47] Judgment reversed and remanded.

Bailey, J. and Crone, J., concur.

---

[12] This was not a situation where Father could not be transported while in custody; he simply was not transported.  *See In re C.G.*, 954 N.E.2d at 922-23 (adopting a list of factors for a trial court to consider when determining whether to permit an incarcerated parent to attend a TPR hearing).  The trial court did attempt to provide due process to Father at the August factfinding hearing by allowing him to participate telephonically and consult with counsel privately and did reset the December hearing when Father was not transported.  It is unclear, however, why Father was not transported for the November Hearing, at which Mother also did not appear because she did not receive notice.

[13] In its clarification order issued December 31, 2019, the trial court expressly acknowledged the need to ensure that parties receive notice of all hearings and rulings on motions.  We trust that the trial court has or will promptly address any administrative failings in this regard so that notice is properly provided in the future.  DCS is also cautioned to comply with its notice requirements, as set out in I.C. § 31-35-2-6.5.